The next case on our docket is number 21-12506, Alan Wigand v. Royal Caribbean Cruises, Ltd. This is number 21-12506, Alan Wigand v. Royal Caribbean Cruises, Ltd. I'll just wait a second for the courtroom to clear, if you will, Mr. Winkleman. All right. I see you reserved five minutes for rebuttal. Is that correct? Yes, Judge. Thank you. Good morning, Your Honors. May it please the Court. My name is Mike Winkleman. This is a case where summary judgment was clearly improperly granted. This is a classic negligence case that should have gone to a jury. There was numerous questions of fact that were—there's so much case law that black-letter law says are questions for a jury. There were three primary errors from the judge. The first was basically a finding that there was no notice that Royal Caribbean had of the danger. But the first error there was the district court judge basically redefining the error. What we set out was that the error was that it was a known danger that these windows were hazardous to kids. And our primary allegation was that this was a huge well-known issue that for years, I mean decades, there were about 5,000 children that are injured or sent to the hospital from Window Falls. I want to skip straight to foreseeability because I think that's your most difficult point. Even if we agree with you that Royal Caribbean had actual or constructive notice that someone falling out the window was possible, how is it foreseeable that an adult would hold an infant or a toddler not on the handrail itself, but over the handrail, feet onto the open window? It might be different if this were a case where a toddler is on the rail, which they have put at a particular distance away from the open window. But in this case, you've taken that extra step of putting the infant on the windowsill, which at least some jurisdiction thought was criminal enough to bring charges. What is the foreseeability of the cruise line that that was a possibility? Mountains of record evidence that goes to foreseeability. The first would be the guest conduct policy, which is literally a written policy. I have a copy of it right here from Royal Caribbean, where the very first thing that they say, is that unsafe behavior prohibited, sitting, standing, jumping, laying or climbing on, over, as Your Honor just said, over the railing, on any exterior or interior railings or other protective barriers is strictly prohibited. Can you read that again where it talks about going over the rail? Absolutely. Okay. Unsafe behavior prohibited. The first line is, fairly to follow all health, safety, security instructions or policies is strictly prohibited. Next line, sitting, standing, jumping, laying or climbing on, over or across any exterior or interior railings or other protective barriers is strictly prohibited. Do you think implied in that is a warning to not risk that someone would put someone else over a railing? That seems a little bit different, a little further to me. I disagree, Judge, because I have two small children with grandparents. It's all the time people are holding their kids close to railings, next to windows. That's a very common scenario. So I think that distinction, while it is a distinction, is such a fine distinction that it shouldn't somehow give them a summary judgment where this doesn't become a question of fact for a jury. Could a former security officer testify that he had seen numerous instances of adults holding children up to windows and on railings? Absolutely. Elton Koopman's testimony, which is record evidence, is clear and succinct about how well-known of an issue this was. This was a problem he dealt with on every cruise. They knew these were — these windows were an issue. He advised other security guards to close the windows. They had safety meetings that talked about it. And that's just another point that goes to foreseeability. First one, guest conduct policy. Second one, Elton Koopman's conduct. But Royal Caribbean argues that if the window — about the window being open, that if you add the fact that the window was open, that changes the notice issue and the foreseeability. Could you speak to that? Well, the issue with the window was that Mr. Arnello, the grandfather, his testimony was clear. He didn't know that the window was open. To him, he'd just gone on this cruise ship. He's only been on there for a couple hours. He literally spends an hour watching Chloe in this children's water park. She's the one who walks over to this window. His intention, his attention as it should be, is focused entirely on her. He thinks he's surrounded by a wall of glass that looks like an observation deck. He said it was like Sears Tower. He says, I never would have thought this was a place where there would be a window open. When I go to Sears Tower, I don't think, do I need to go and check to see if there's a window that's open? You just wouldn't think that way. So, of course, if the window was closed, Chloe would still be alive. And more importantly, Judge Pryor, if Royal Caribbean had followed any of the well-established ASTM window fall prevention guidelines, Mr. Arnello's conduct is completely irrelevant because either they had a screen on there, either they had guards on there, or they had a window opening that only opens four inches, the size of your palm. Chloe could not have died in that circumstance. And if they didn't want to follow any of those well-established guidelines, then put a warning on it. You've seen the photos, Your Honors. Put warning, these windows open. Or put decals. If you had the beautiful Royal Caribbean logo on every one of those windows, it would be crystal clear to know whether or not it was open or closed. Other than a window that only opens four inches or not at all, when you talk in your brief about fall prevention measures, what do you mean? What else could they have done other than have closed windows or only partially opening windows? So there's two parts to that. Part A is what they already did. And Royal Caribbean, through its 30B6, testified, we have fall prevention from windows measures in place. That was the railing. That was the height of the railing. That was, remember, there's three different windows. It was that the lowest window doesn't open so kids can't walk out of it. And there was a third. The height of it. That's what they did, which shows they were on notice of it. You don't do something unless you have to do it and you're on notice of it. What we argue, which was the crux of our case, was what they should have done was follow the ASTM fall prevention measures, which Your Honor just mentioned, four inches limitation screens or guards. Your Honors, we say one of the primary errors was the way that the district court reframed the issue. The judge said the danger, the risk in this case was Mr. Arnello was the grandfather. That's not what we alleged. What we alleged was always the same thing from day one, which was the negligence, at least in part, was the failure to follow the ASTM window fall prevention guidelines, which have been around since the 90s. The district court's order doesn't even say ASTM in it. It doesn't say it. How does this case change if instead of going up to an open window at the pool deck, they're on the back of the boat where there is no window, and he holds her on top of the rail and then holds her over? No case. I wouldn't have taken that case. So the case is solely because he mistakenly believed it was closed glass and it was open. No, it's more than that. That's a big part of it, but a bigger part of it is this is such a unique setup, and when you talk about open and obvious, it's about looking under the circumstances. This is an unbelievably unique window next to a kids' water park 150 feet in the air with a very unusual design that opens 52 inches. I've been on that ship. Is that really a unique design? I mean, maybe that's not what we're here to decide, but would you really want to be in a cruise ship that's entirely enclosed in glass? That feels pretty hot to me, right? Judge, that's an open deck. The whole deck is wide open. It's a pool deck. So I think the reason why they have those is for additional ventilation, but that doesn't change the fact that you're on an open-air deck. I guess that's the question. One thing that I saw in the testimony was that people who picked up their children to that area often were doing it so that they could feel the breeze. Doesn't that suggest that it was pretty obvious that the window was open? Based just on what you said, yes, but here, this is the middle of somewhere in Puerto Rico, and what the testimony was from Mr. Inel was that he didn't feel any breeze. You could also have issues about how much sun there was in terms of whether or not you could make differentiations. In either way, probably the jury just needs to decide that is what you would say, right? Absolutely. What about your argument about the court defining the danger too narrowly? Is there any end to that argument? Is the plaintiff completely in control of how the danger is defined for these purposes? This circuit defined that in a case called Yusko, Y-U-S-K-O, that said that the plaintiff is the master of his or her complaints. That means we're the ones who get to make the allegations. Our allegations have always been the same, have always been failure to follow the ASTM. The district court said, no, this was about the grandfather. But the danger wasn't the grandfather. The danger was the failure to follow the ASTM. But that's about breach rather than notice, right? I mean, and that is actually another question I had. You didn't, I don't think, brief breach to us. So we, I think, would be limited to denying Royal Caribbean's summary judgment motion rather than granting yours because the district court, even if we agree with what you said, the district court would still need to look at breach, right? I tend to agree with that, and we did not appeal the denial of ours. Our summary judgment was granted in part, denied in part, which we did not appeal. So if you were to win, it would just simply go back for trial? Absolutely. Okay. On open and obvious, which I know only applies to one of the three, the failure to warn, Mr. Anello testified that after watching the video that he could tell the window was open. And your own expert, your own witness, Mr. Koopman, testified that if you put someone's feet on the ledge, you would know that it was open. And when you watch the video, to me at least, it's very clear when you look at that bank of windows which two spots are open. And not coincidentally, I think, that's the only spot where people go to look out over the rail. What is your best argument that this wasn't open and obvious with regard to failure to warn? Well, I want to address your specific question, which is I think if you look back and you looked at photos and you asked a thousand people, is this window open or is this window closed, most people would get it right. But we have to put ourselves in that exact moment when Mr. Anello is watching Chloe. He's just gotten on the ship. She's the one who leads him over there. His attention is entirely on her, and he walks right up to the window. So he doesn't have perspective from 20 feet away where you can easily see what's open and closed. He's right there in that 52-inch frame, which I've stood in. You can't see any of the surrounding windows around you. So whether or not it's open and obvious, you have to look at all these unique circumstances to say whether or not it was reasonable or not. Even the fact that he says he reached out and didn't touch anything, even though his arm is shorter than the length, even though you can watch him lean completely forward in the video. And, again, he testified three times that he put her feet on the ledge, which even Mr. Koopman says you wouldn't do that if the window was closed. I agree with you in part that Mr. Anello was negligent. And in a perfect world, obviously, we would go back and change that. But his negligence, which obviously is a whole other thing, was superseding cause that we didn't really talk about, and we can, of course, if Your Honors would like. But as it relates to that, you have to look at those exact situation. This all happens in a matter of seconds. I mean, Royal Caribbean says this is 34 seconds. The district court said he held her out for eight seconds. These are such fractions of time. And this is a person who's on vacation, no alcohol involved, just gets on the ship, watching his granddaughter. And, remember, they're from Indiana where hockey is in their blood. She used to love to go to watch her older brother's hockey games and bang on the glass. That was in her little DNA at 18 months old. That's what she wanted to do. That's why he lift her up. It was such a catastrophic mistake. But it was still – that's why you have these window fall prevention codes in place. Royal Caribbean wants to say this is the anomaly where the grandfather held the child out of the window. The only situation where that ever happened was with Michael Jackson, and Michael Jackson kept the kid inside. So it's not the anomaly of the grandfather. 5,000 kids are injured annually in accidental window falls. This is an accidental window fall. That's why we have codes in place that Royal Caribbean did not follow, even though they were on notice of the issue. And those are questions of fact that our jurors should decide. I did have – you mentioned it before you sat down. One question on the superseding. I don't think I ever understood from the record, what specific crime did Mr. Anello plead guilty to and what are the elements of it? Because we have said generally a superseding criminal act could cut off proximate calls. So what did he plead guilty to? And if you know, what are the elements of that? He pled guilty to negligent homicide. The specific evidence in Puerto Rico I don't know, but of course with the word negligent in there, it implies that there was an element of negligence rather than intent. I think what's critically important as it relates to causation is that – I mean, again, the most important thing is foreseeability. Does Royal Caribbean – is it foreseeable that somebody would commit this particular crime, which is negligent homicide? I think because I lost my train of thought, but what I wanted to say was Your Honor mentioned the case that was cited to by the district court, which is a case called Decker and a case from 1982 that talked about this issue. But in that case, that was a case where summary judgment was granted and then summary judgment was reversed. And what the court said verbatim in there was that foreseeability is ordinarily a question of fact for a jury, which is exactly what the situation should be here. I have one more question. Isn't there some tension between your argument that the cruise line knew of this danger because of their warnings at the beginning, do not go over the rail, do not, et cetera, et cetera, versus the failure to warn? Why don't those cancel each other out? I think they should – I mean, I think at worst it creates a question of fact, but I do think they cancel each other out. I think that if they're on notice of it and they're warning about it, that shows there's notice and therefore it should be a question of fact for a jury. Right, but why do you still have a failure to warn claim if they've warned about it? Because they're separate and distinct concepts. One of them was their negligence in not following the ASTM codes, and then the failure to warn portion of it really has to do with what I talked about briefly was there should have been decals or there should have been a warning on that white window sill that you see in front of the railing. So your argument is that the warning, the overall warning wasn't sufficient. Correct. Rather than there was no warning. Okay. Thank you. One follow-up question based on that. If the window is open, you wouldn't have been able to see the decal, right? Correct. But if you're walking up and you've got a — on this side of the ship that day, this was really like — seemed like seemingly the only window that was open. So if you had Royal Caribbean decals everywhere, but you didn't have it there, that would be a clear trigger that there was — the window was open. But I'm also saying on that white sill or on the railing, it should have said, caution these windows open. Okay. Thank you. You're answering the Court's questions, so we will give you back your full time for rebuttal. Thank you. Mr. Dono. Good morning. Michael Dono on behalf of Royal Caribbean Cruises. May it please the Court. Bottom line here is this incident has never occurred before. This ship has been sailing since 2004, and there has been no incident where any passenger has fallen out one of these windows. It doesn't only include this particular ship that had been sailing since 2004. It involves 25 other ships that are in Royal Caribbean's fleet that also have this same window configuration. No substantially similar incidents there. You'd have to say, and we'll get to Mr. Anello's conduct in a minute, but you'd have to say it's at least foreseeable that someone could fall out the window based on the fact that you do have the three-window system, you have the distance between the rail and the window. Like you have taken measures to make it harder for somebody to fall out the window, which means you at least can foresee that somebody could. I mean, that's the reason we don't open windows in hotels on the 10th floor is because we see that if you allowed people to open the window the whole way, they could fall out. So theoretically it is foreseeable someone could fall out of a window, correct? Maybe not the way this happened, but in a general sense, somebody could fall out one of those windows. There is a general fall hazard on a cruise ship just like you could fall off a balcony. You can fall off, I believe it was you, Judge DeMays, that brought up the example of what if this had happened at the back of the ship on the rail. Yes, there's a general fall hazard, but that doesn't mean that there was anything dangerous with this particular window. And more importantly, that there was, that Royal Caribbean had any specific notice here that Mr. Anello would pick up this child, would first lean out, lean on the railing where the window is only 19 inches from the railing, stay there for 8 seconds. And this is testified to by Mr. Anello, and the objective video evidence confirms this. He leaned up for the rail for 8 seconds. The window's open at this time. That's not disputed. He then picks up the child, he carries her up, places her over the rail and onto the windowsill. That's what he testified to. And he's there in that general area for 34 seconds. These windows are, one of the things that's obvious and is what struck me from, and it's pictured in my brief, is this isn't a window that completely slides open. If you look at the picture, I believe it's at the bottom of page either 15 or 17 of my brief, you will see there is a handle and there's a frame with part of the window still present. So you can tell, there's no need for a sticker here. You can tell there's still a window frame and of different colored panes right in front, right where he presented that child to the open window. Let's assume that all of us agree with you that it is open and obvious that the window is open. That when he placed the child on the ledge, he knew the window was open. That gets rid of the failure to warn claim. But there's still the argument that it was foreseeable that a child could fall out in a similar circumstance. It is foreseeable that grandparents or parents will hold their children up to the rail or hold them up to a windowsill so that they can feel the air, feel the breeze, and then an accident happens, negligence, as he pleaded to, and the child falls. So even if it's open and obvious, that's irrelevant to the general negligence and the failure to maintain counts. What makes this case viable for summary judgment instead of going to the jury on the question of foreseeability, which this Court has said, this Court and its previous iteration when it was in the Fifth Circuit, has often said is a question for the jury. It's generally a fact question. What do you believe? Do you believe this was foreseeable or don't you? What makes this different? What makes it different, Your Honor, and again it goes also to the notice, is that no one has ever fallen out of this window. And their claim, again, is that the reason that she fell was because they didn't know the window was open. So that just can't, that just, again. What about USCO? How do you think your argument that the District Court was correct to narrow the question of notice? How does that work with our USCO precedent? Well, I would say the District Court here, I wouldn't say they narrowed it. I think that's what the issue was. The issue here consistently was that the reason that this child unfortunately fell out the window was because Mr. Arnello thought that the window was closed. So it's a conspicuity issue with the window. That's really what the defect is. Then later it became, well, you should have put a safety net or the window should have opened four inches. But that was never really the question here. The question was that the defect. It seems to me that this case is very like the Amy versus Carnival case because there the child fell through a railing or over a railing, and we reversed the District Court because the District Court had said the risk-creating condition was, you know, either the rails were too far apart or the railing wasn't high enough. And in reversing that case, we said, no, the risk-creating danger is falling from a railing, either through or over. And so why isn't this case the same where the danger is falling through a window rather than the danger that somebody would hold a child up to a window, the more specific circumstances? Again, because if you look at the record in this case, it's undisputed that there is no incident like this had occurred before. Nothing that would have alerted. But, you know, there doesn't have to be a similar instance, right? The other way you can show notice is that it was, you know, something that was known, something that was recognized. For example, it's in your policy. Don't stand on the railing. Don't climb over the railing. Well, the thing with Amy is that it involved the warning. The warning has to be specific to the danger that's present. In Amy, the warning, which is the same guest conduct or similar guest conduct policy that we have here, specifically warned us to a danger with the railing. Here, the railing is almost, I hate to use this phrase, but it's almost a red herring. No, because the railing is one of the ways in which the cruise line says it prevents people from falling out windows. Right. That's one of the safety measures. You have this railing. How do you address what Mr. Winkleman read to us, which is in your manual or in your safety warnings, it says on, over, or across the railing? That means somebody at Royal Caribbean at some point thought someone not only would stand on the railing, but would try to go across it. So your own notice, or at least you believe it is possible, that somebody could either go across or be placed across the railing, and you're warning people not to do that. For obvious reasons. If you go over the railing, you could fall. Right. The question is, isn't the addition of the word across enough to let a jury find? It doesn't mean they will. But the fact that you included don't go across the railing enough to allow the jury to determine they could have foreseen someone placing a child across the railing. They wouldn't have said it if they didn't think it was possible. I would respectfully say no. I don't think it goes to the jury on that, and this is why. One, because the railing here, if you go over it, you're simply over it. You're not out of a window. There's a 19-inch gap between this railing and the windowsill. It's not the situation in Amy where the specific warning was the danger presented by the railing. And also another fact that distinguishes this case from Amy was the warning is for people themselves not to engage in this conduct. Here you had a person who deliberately picked up this child and put them outside of this window, put them on the windowsill. You're saying the warning would have needed to say, do not stand on windowsills in order to suggest that there is notice? I would say so. So the issue here is, again, the danger presented by the window, not so much by the railing, which was the issue in Amy. The child felt it was disputed, but it was either through the railing or she climbed up on top of the railing, so it's more— That's also intentional conduct. You're saying that the difference here is the fact that he intentionally placed her over, but in Amy, the child intentionally climbed over or intentionally climbed through. So what's the difference? Both are intentional. Both are things that you could have a reasonable jury—I'm not saying I would. I'm saying a reasonable juror could say if the child intentionally climbed over the rail, then you could have foreseen that happening. By the same token, you could have foreseen that an adult would have intentionally held the child on or across the rail. Why is that different? I would say it's different in this case because that was not—again, it goes to the question of foreseeability. That was just not foreseeable that in this particular section of the ship. Again, this is a general warning. It's not a specific warning as to this rail here on this ship that presents this particular situation. There's testimony in this case, though, that at meetings of staff, the former chief security officer, they talked about parents holding children up to windows, parents putting children on rails, and they discussed warning parents about this issue. Right. And the distinction there is he was talking about the wooden rail that we're talking about, not about extending them out into the windowsill. When he was asked about have you ever seen, and he was described— I thought he testified that children were held up to open windows, that they had seen that, and that was discussed. Well, I believe if you read his deposition testimony, he said held up to windows as in they were held, they were carried while in front of the window. Well, that sounds like a— He said they were laid on the rail, like held them up to the rail. I believe he—and this is in— Are you saying the rail versus the sill? Is that the distinction that you're drawing? Windowsill, right. There's the wooden rail that's in front of the windowsill that's 19 inches away from the windowsill. What he testified to when he was specifically asked, and he was given the objective evidence in this case, what Mr. Arnello had testified to, and what the video reflects, he said he had never seen that. He had never seen a child placed there. That's what he testified to. But then that's—you go back to the whole Amy question of what's too specific in terms of the risk-creating condition, right? Let me ask you another question about the record. So when I looked at Mr. Arnello's testimony, he insisted that he thought there was a window there. He never conceded that he knew the window was open. Is that right? He never—from my recollection, he never conceded that it was open. Obviously, he testified that given the facts of what happened, it was. And wasn't there expert testimony about whether he could have reached the open window from where he was behind the railing? Yes, and it was established that given his arm length, which I believe was something like from shoulder to the end of his fingertips was 29 inches, and from the beginning of the wooden railing out to the windowsill was 19 inches. So there was about—I want to say about 10 inches or so where he would have been able to touch glass. It's 19 and 27. You've got a picture of it on page 8. And you could clearly see from that individual standing there that it is reachable. And that's what he testified to. As he was holding the child out, he was trying to feel for glass and never did. Isn't—regardless of what we think, how credible we think his testimony is, isn't that the kind of issue that a jury is better positioned to decide? No, I don't think so, especially in light of the fact that we have the video evidence in this case which is objective and confirms what he testified to. And do you agree that breach, even if we agreed with your friends on the other side, that breach would still need to be decided by the district court before it would proceed, before the case would go to trial? I believe on this record there is no evidence that Royal Caribbean breached a duty of care. And before you reach the issue of breach, again, you have the issue of notice, which I cannot stress that this is the first incident of its kind. But let's say—I'm not saying that we would decide that there is notice, but let's say we did. And let's say we decided that we agreed with your opponents on everything except breach. Do you think the district court still has a decision to make on breach, or does it go straight to a jury? Well, certainly the district court can entertain whether a duty was breached here. I don't think that is necessary given the reasoning that's presented in the district court's order, where it has found that Royal Caribbean did not have notice. Right, but I'm saying if we disagree with all of that, right? So take it for granted, just for the purposes of this question, that we disagree with the district court's decision on those aspects. Would the court still need to consider and decide breach before it went to trial? To yes. The court can definitely entertain that issue before it reaches the jury. Who—did you seek summary judgment on breach? I don't think you did. Yeah, I guess that's a better—that's a more positive question. Yeah, you didn't seek it, and therefore there's nothing to look at. They did seek it but didn't appeal, which means they've lost. You didn't ask for it, so there'd be nothing left to do. If we were to, again, hypothetically agree with them on the other elements, it would just go back to trial. To be candid with the court, I do not know if that was raised in our motion for summary judgment. I suspect Mr. Winkleman will know because he was there. I see my time is up. Thank you so much. I would just ask the court to affirm the summary judgment finding in Royal Caribbean's favor. Thank you so much. And, Mr. Winkleman, as you come forward, if you can answer Judge Grant's questions about breach, who raised it, who didn't, what is left to be done, if anything. Your Honor, you took the words out of my mouth. I've made a note that the issue was not raised at the summary judgment stage. They argued notice. They argued superseding cause, and they argued open and obvious. So that proverbial ship has sailed. So, yes, we ask Your Honors to reverse, and we go straight to a jury trial. The only other point I would raise was just that Mr. Coopman's, Elton Coopman's testimony, former chief security officer for Royal Caribbean on this very ship, succinctly testified at page 121, line 23 in his deposition, that he had seen instances where children were held outside the window, and he was talking about the specific window sill. I have one question, and it's a little bit difficult, so I'm going to change the scenario. Right? This is not your client. This is not a grandfather. But let's say that one passenger, one cruise guest, picked up a child to whom they were not related and threw them out an open window. How does that case change? That's such an extreme fact pattern. I almost agree with you that I probably wouldn't take that case, and that's all that we do. Well, it's much less sympathetic, right? But how does it change the legal elements about all the things we've been talking about? Well, the point that I would make is that that's why, at least in part, you have these window fall prevention ASTM codes in place, because if you're in this specific spot on the ship, obviously if it's just an open balcony and you're going to throw someone overboard, that's easy to do. But when you have these specific windows, you have these specific codes that are designed to present accidental window falls that were not followed. I agree you're talking about someone basically murdering someone, which is different. But in this case— But at that point, though, is the risk an open window, or is the risk that someone will pick up another person and throw them out the open window? It's both, and that's where the district court erred, because we said it was the failure to follow the ASTM guidelines. They said it was Grandfather Ornella. But that failure to follow guidelines sounds a lot more like breach than it does like a risk. I mean, guidelines respond to a risk. They don't constitute the risk. Well, I agree with that. When you have guidelines that people either knew about or should have known about, then they're on notice. But I completely agree breach is a separate issue. Let's change the hypothetical just a little to bring it closer to what we have. Let's assume they're on the back deck. There's no windows, just a rail. Two adults get into a fight. Adult one punches adult two. Adult two gets so mad that he shoves adult one so hard that he hits the rail and goes over the top and falls to his death. He is charged with and pleads guilty to negligent homicide. He didn't intend to kill him. He intended to push him hard because he got punched in the face. Is it foreseeable, and thus does this act of punching and pushing, is it so foreseeable that Royal Caribbean is on the hook, or is it so unforeseeable that this criminal negligent act occurred that they're not liable? Are they going to be liable any time people get into a fight and negligence occurs? Absolutely not. What's the distinction here? The foreseeability of it, that this was a known issue, that they had the policy that we looked through that says don't put people over rails, that we had Elton Coopman, their own chief security officer, saying this was a known issue and he had seen people putting on these exact windowsills, the fact that they had all these fall prevention measures in place. But I agree with you, Judge Mayes, there's no case in the fight where someone, the other person, goes overboard. But I hope you realize that's a completely distinguishable situation that we have here. Thank you very much. Thank you.